UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:17-CV-38-TBR


JOSEPH EARL WHEELER                                                        PLAINTIFF

v.

GRAVES COUNTY, KENTUCKY, et al.                                          DEFENDANTS

## MEMORANDUM OPINION & ORDER

This matter comes before the Court upon Motion for Summary Judgment filed by Defendants Graves County, Kentucky and Dewayne Redmon. (R. 28). Plaintiff Joseph Earl Wheeler has responded, (R. 41), and the Defendants have replied. (R. 44). This matter is ripe for adjudication and, for the following reasons, **IT IS HEREBY ORDERED** that Defendants' Motion, (R. 28), is **GRANTED.**


## BACKGROUND

Plaintiff Joseph Earl Wheeler suffers from a seizure disorder. (R. 1). When he has suffered seizures in the past he has become disoriented and combative. (R. 33, Wheeler Depo., p. 30). Wheeler admits that when suffering a seizure, he is irrational, disoriented, and subject to harm if not medically treated. (*Id.* at p. 79.). Wheeler wears a medical alert necklace, which was tucked underneath his shirt during the events that follow. (*Id.* at pp. 21-22.)

On March 12, 2016, while driving from Tupelo, Mississippi to Paducah, Kentucky, Wheeler stopped at a Minit-Mart on Highway 45 to use the restroom. (*Id.* at pp. 18, 20). Upon exiting the restroom, Wheeler had a seizure and collapsed. (R. 1, Wheeler's Compl., ¶ 12). The Minit-Mart attendant called the police to report that a man had fallen outside the restroom and may

be dead. (R. 28, Def.s' Mot. for Summ. J, Exhibit A). The police and Emergency Medical Services were dispatched to the Minit-Mart.

Graves County Sheriff's Deputy Phillip Burnett was the first on scene. (R. 35, Burnett Depo., pp. 10-11). Upon arrival, Burnett found Wheeler incoherent, sweaty, and nonresponsive to questions. (*Id.* at pp. 10-11, 16). According to Burnett, he believed "that it was something medical happening," and believed Wheeler to be an "ongoing danger to himself or someone else." (*Id.* at p. 12.). While waiting for Emergency Medical Services, Deputy Burnett attempted to seat Wheeler inside a banquette and told him to relax. (R. 28, Exhibit B, Body-Camera Footage from Deputy Burnett). Wheeler would sit only for a few seconds, then get up and become combative. *Id.* Several times Wheeler attempted to push past Burnett and leave the Minit-Mart. (*Id.;* R. 35, Burnett Depo., pp. 11-13). Wheeler's behavior prompted Burnett to call for back up. (R. 35, Burnett Depo., pp.13-14).

Captain Prince, responding to Burnett's call for backup, was second on scene. (R. 34, Prince Depo., p. 10). As the two officers and Wheeler continued to wait for Emergency Medical Services, Wheeler continued to be combative. (R. 28, Exhibit B, Body-Camera Footage from Deputy Burnett; R. 28, Exhibit C, Body-Camera Footage from Captain Prince). He made several attempts to leave the Minit-Mart and continued to shove the officers and resist their attempts to gain control. (*Id.*; R. 34, Prince Depo., p. 15). Consequently, the officers called for additional backup. (R. 28, Exhibit B, Body-Camera Footage from Deputy Burnett; R. 28, Exhibit C, Body-Camera Footage from Captain Prince). The officers were attempting to keep Wheeler contained inside the Minit-Mart so that they could figure out what was wrong with him and keep him away from the highway and local elementary school, both of which were in close proximity to the Minit-Mart. (R. 34, Prince Depo., p. 15-16; R. 35, Burnett Depo., p. 17).

Around the time that Emergency Medical Services were arriving on scene, the two officers had finally managed to pin Wheeler in the banquet. (R. 28, Exhibit B, Body-Camera Footage from Deputy Burnett; R. 28, Exhibit C, Body-Camera Footage from Captain Prince). Wheeler continued to resist, even beginning to kick at one point. (*Id.*). The officers' struggle was made worse by the fact that Wheeler's skin was slick with his own sweat and saliva (Wheeler began spitting during the struggle). (*Id.*). Wheeler had been mumbling throughout the struggle, but at this point can be heard saying things like "let me go" and "please." (*Id.*). The officers can be continually heard saying things such as "we can't let you hurt yourself" and "calm down." (*Id.*).

While the officers struggled to keep Wheeler seated in the banquet, EMT's took a blood sugar reading from Wheeler to see if low blood sugar could be causing Wheeler's behavior. (R. 28, Def.s' Mot. for Summ. J., Exhibit G, EMS Report). The reading was normal. (*Id.*). Neither the EMT's nor the officers gave any indication that they suspected Wheeler had suffered a seizure. (R. 28, Exhibit B, Body-Camera Footage from Deputy Burnett; R. 28, Exhibit C, Body-Camera Footage from Captain Prince). Instead, after ruling out the possibility of a diabetic episode, the officers, along with the EMT's, began to suspect that Wheeler's behavior was induced by a drug over-dose and or the result of a brain bleed caused by the fall while coming out of the restroom. (R. 34, Prince Depo., p.22-23, 33-34, 60; R. 28, Exhibit B, Body-Camera Footage from Deputy Burnett).[1] Although Deputy Burnett attempted to check Wheeler's wallet for a medical card, no one checked Wheeler's necklace, which, other than the chain around the back part of Wheeler's neck, remained tucked beneath his shirt. (Exhibit B, Body-Camera Footage from Deputy Burnett; R. 34, Prince Depo., pp. 36-37; R. 35, Burnett Depo., pp. 39).

---

[1] EMT's can be heard suggesting the possibility of a brain-bleed on Deputy Burnett's body-camera footage at 14:57:35.

The officers then transitioned Wheeler from the banquet to the floor to hand cuff him for transport to the hospital. (R. 28, Exhibit B, Body-Camera Footage from Deputy Burnett; R. 28, Exhibit C, Body-Camera Footage from Captain Prince). On the way to the floor, and once there, Wheeler continued to resist. (*Id.*). Wheeler and the officers landed in a relatively tight area between the banquet and a store display. (*Id.*). Wheeler came to the ground face-down with his hands underneath him. (*Id.*). Once on the ground, Wheeler refused to place his hands behind his back to be cuffed. (*Id.*). At some point after Wheeler and the officers went to the ground, Sheriff Redmon arrived. (R. 32, Redmon Depo., p. 15; R. 34, Prince Depo., p. 19; R. 35, Burnett Depo., p. 23). Redmon positioned himself at Wheeler's head and attempted to assist the other deputies in controlling Wheeler's hands and arms. (R. 28, Exhibit B, Body-Camera Footage from Deputy Burnett; R. 28, Exhibit C, Body-Camera Footage from Captain Prince).

On the ground, the officers continued to tell Wheeler to "stop resisting," to "relax," and to "stop fighting." But Wheeler remained noncompliant. (*Id.*). Finally, Captain Prince warned Wheeler that he was going to Tase him. (*Id.*). Wheeler continued to fight, and Captain Prince deployed his taser in "drive-stun"[2] mode against Wheeler. (*Id.*; R. 34, Prince Depo., p. 22). There was no change in Wheeler's behavior after the first drive-stun, so Captain Prince attempted to drive-stun Wheeler again. (*Id.*). But again, Wheeler continued to resist. (R. 28, Exhibit B, Body-Camera Footage from Deputy Burnett). After the second attempted drive-stun, Captain Prince placed his taser on the banquet seat and continued to assist Deputy Burnett and Sheriff Redmon in trying to handcuff Wheeler. (R. 34, Prince Depo., pp. 22-23). At this point, more officers had arrived on scene. (R. 28, Exhibit B, Body-Camera Footage from Deputy Burnett). As Deputy

---

[2] A "drive-stun" is when the taser is placed directly against the skin to electrocute without launching the hooks into the subject's skin. Unlike when the hooks are fired into the skin, which completely incapacitates the subject, drive stun mode causes sever pain, but leaves the victim conscious and able to comply.

Burnett, Captain Prince, and Sheriff Redmon continued to struggle with Wheeler's arms, one of the other officers to have arrived on scene picked up Captain Prince's Taser and attempted a third, and final, drive-stun, at which point the officers were finally able to position Wheeler's arms behind his back. (R. 34, Prince Depo., p. 23; R. 28, Exhibit B, Body-Camera Footage from Deputy Burnett). After some further struggle, Wheeler was finally cuffed, strapped on the stretcher, and placed inside an ambulance for transport to the hospital. (*Id.*).

At the hospital, it was determined that Wheeler had suffered a seizure. (R. 34, Prince Depo. p. 30). The hospital staff was told that Wheeler was drive-stunned three times. (R. 28, Exhibit D, Body-Camera Footage from Officer Mason). However, Wheeler does not recall being treated for any injuries caused by the Taser. (R. 33, Wheeler Depo., p.116). Once it was determined that Wheeler's behavior was caused by a seizure, Sheriff Redmon decided not charge Wheeler with a crime. (R. 32, Redmon Depo., pp. 50-51).

Captain Prince's Taser report indicates that the Taser was used three times during the incident and that each time it was deployed for around five seconds. (R. 28, Exhibit I, Taser Report). However, there is no way to determine whether the Taser maintained contact with the subject for the entirety of the five seconds. (R. 28, Exhibit H, Vike Report). In fact, it is unclear whether the Taser ever successfully made contact with Wheeler's skin during any of the attempted drive-stuns.[3]

Wheeler filed the instant suit on March 14, 2017, bringing § 1983 excessive force claims against John Doe, and Sheriff Redmon, for their use of force against Wheeler inside the Minit-Mart. (R. 1). Wheeler also brought Fourth Amendment claims against Graves County, the Graves County Sheriff's Department, and Sheriff Redmon for failure to properly train their law

---

[3] In drive-stun, mode the Taser must contact the subject's skin in order to electrocute the subject. (R. 28, Exhibit H, Vike Report).

enforcement officers. (*Id.*). Finally, Wheeler brought Title II disability discrimination claims under the Americans with Disabilities Act ("ADA") against Graves County and the Graves County Sheriff's Department, alleging that Graves County and the Graves County Sheriff's Department failed to implement policies, practices, and procedures and failed to train John Doe in this regard. (*Id.*). Wheeler further claims that Graves County and the Graves County Sheriff's Department are vicariously liable for the acts and omissions of John Doe, which violated the ADA. (*Id.*). The Graves County Sheriff's Department was dismissed from this action on April 6, 2017 by Agreed Order. (R. 7). The remaining Defendants now move for summary judgment on Wheeler's claims. (R. 28).

**LEGAL STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). The plaintiff may accomplish this

by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). Mere speculation will not suffice to defeat a motion for summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

### A. Wheeler's Claims Against John Doe are Time-barred.

The Defendants argue that Wheeler's claims against John Doe must be dismissed because Wheeler failed to substitute anyone prior to applicable statute of limitations. Wheeler makes no argument to the contrary.

As the Defendants correctly point out, substitution of a John Doe claim must occur prior to the applicable statute of limitations. *Smith v. City of Akron*, 476 F. App'x 67, 69 (6th Cir. 2012). In Kentucky, the statute of limitations for § 1983 claims is one year. *E.g., Collard v. Kentucky Board of Nursing*, 896 F.2d 179 (6th Cir. 1990).

Here, the events that gave rise to the § 1983 claims against John Doe transpired in 2016, well over two years ago. Wheeler has failed to substitute anyone in place of John Doe. Moreover, by failing to respond to the Defendants' properly supported summary judgment argument, Wheeler is deemed to have abandoned his claims against John Doe. *See Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir.2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a

response to a motion for summary judgment); *Clark v. City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir.2006) (recognizing that the failure to respond properly to motion for summary judgment arguments constitutes abandonment of a claim). Therefore, all Wheeler's claims against John Doe are dismissed with prejudice.

**B. Wheeler's Excessive Force Claims**

The Defendants make two arguments for dismissing Wheeler's excessive force claims. First, the Defendants argue that Wheeler's claims require the jury to speculate as to whether Wheeler was Tased. Second, even if Wheeler was Tased, such force was not excessive as a matter of law given the circumstances. Wheeler responds that "the Defendants ask the Court to abandon the dictates of Rule 56 and draw inferences from the facts in their favor to conclude a TASER wielded by trained law enforcement officers to inflict pain on an arrestee did not work as intended" and argues further that whether the force used was excessive is question for the jury. (Reponse 15) (emphasis in the original). The Court will address the Defendants' arguments in turn.

1. Wheeler's Claims Require Reasonable Inference—Not Speculation.

The Defendants contend that because there is no evidence to indicate that the Taser made contact with Wheeler's skin, the Jury would be required to speculate as to whether Wheeler was actually drive-stunned. The Court disagrees.

Defendants are correct that the neither the Jury, nor the Court in ruling on a motion for summary judgment, may speculate. *M.T. v. Saum*, 3 F.Supp.3d 617, 623 (W.D. Ky. 2014) (citing, Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1177 (6th Cir. 1996)). However, the Jury may, and the Court at summary judgment must, draw logical inferences in Wheeler's favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.

Ed. 2d 538 (1986) (requiring all reasonable inferences to be drawn against the moving party during summary judgment) ; *See also Saglioccolo v. Eagle Ins. Co.,* 112 F.3d 226, 228 (6th Cir. 1997) (stating that when a factual allegation is capable of more than one reasonable inference, it must be construed in Plaintiff's favor). The line between what is a logical inference and what is speculation can sometimes be blurry. But typically, speculation is closer to a guess, whereas a logical inference is a reasoned decision to draw a conclusion as to a disputed fact from an undisputed fact. In other words, an inference is anchored in concrete evidentiary fact, whereas speculation has no such factual anchor. *See SEC v. Gonzalez de Castilla*, 184 F. Supp. 2d 365, 376 (S.D.N.Y. 2002) (compiling various authorities, all of which hold that speculation is closer to a guess, whereas an inference is based on reason and anchored in evidence or fact).

Here, the Defendants argue that there is no evidence that the Taser ever contacted Wheeler's skin. To the extent that there is no *direct* evidence of this fact, the Defendants are correct. The Deputies' body camera footage did not capture the Taser contacting Wheeler's skin because the Taser was out of frame. (*See* R. 28, Exhibits B, C, D) (the Taser is off camera when deployed). Instead, it only captured the clicking sound the Taser makes when engaged. (*Id.*). While the Taser report indicates the Taser was deployed three times, it does not report whether the Taser successfully contacted Wheeler. (R. 28, Exhibit I, Taser Report). Finally, Captain Prince testified that he was not sure whether the Taser contacted Wheeler's skin, and from the Deputies' body-camera footage, Wheeler's behavior seems unchanged before, during, and after the attempted drive-stuns. (R. 34, Prince Depo., p. 23; R. 28, Exhibit B, Body-Camera Footage from Deputy Burnett).

However, there is indisputable evidence that the Taser was deployed three times in an attempt by trained professionals to drive-stun Wheeler. Furthermore, it is clear from his body-

9

camera footage that Officer Dale Mason told the Doctors treating Wheeler that he had been

drive-stunned three times. (R. 28, Exhibit D, Body-Camera Footage from Dale Mason). It is

from this factual evidentiary anchor that the Court can, and must at this stage of the proceedings,

reasonably infer—not guess or speculate—that the trained officers were successful in drive-

stunning Wheeler. Thus, the Defendants' arguments fails.

2. Assuming the Deputies Drive-Stunned Wheeler, Such Force was Not Unreasonable
   Under the Circumstances.

Relying on the considerations pronounced in *Graham v. Connor*, 490 U.S. 386, 395-96,

109 S. Ct. 1865, 104 L. Ed. 2d 443 (1990), Wheeler argues that whether the force applied was

reasonable is at least a question for the jury. Conversely, and relying on *The Estate of Hill v.

Miracle*, 853 F.3d 306 (6th Cir. 2017), the Defendants argue that the force used was reasonable

as a matter of law. Following the Sixth Circuit's clear guidance, the Court must agree with the

Defendants.

The United States Supreme Court has held that all claims made against law enforcement

officers contending that they used excessive force during an arrest or seizure should be analyzed

under the reasonableness standard of the Fourth Amendment. *Graham,* 490 U.S. at 395-96.

Typically, in determining whether the force applied by officers was reasonable, the Court would,

as Wheeler suggests, consider the *Graham* factors: "severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and whether [the

suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* However, the

Court agrees with the Defendants that the Sixth Circuit's recent decision in *Miracle* proves better

guidance under these circumstances.

In *Miracle*, Corey Hill suffered a diabetic episode in his home. His girlfriend called the

police, and four EMT's, followed by Deputy Christopher Miracle of the Oakland County

Sheriff's Department arrived on scene. Hill was disoriented and became combative after EMT's pricked Hill's finger to test his blood-sugar levels, which were critically low. The EMT's had to pin Hill down to insert an IV catheter into his arm so that they could intravenously administer dextrose to raise his blood-sugar levels. After the IV was inserted, Hill became increasingly combative, attempting to punch and kick the EMT's. Hill also ripped the IV out of his own arm. At this point, Deputy Miracle, who had not yet joined the fray, ordered Hill to "relax." Hill was noncompliant. Miracle warned Hill that he would have to use his Taser if Hill did not stop resisting. Hill remained noncompliant. Deputy Miracle then drive-stunned Hill. Hill then became compliant, but later sued Hill for excessive force.

In reversing the district court, the Sixth Circuit declined to apply the *Graham* factors to Deputy Miracle under the circumstances, because to apply the *Graham* factors to an officer confronted with a combative subject experiencing a medical emergency would be "equivalent to a baseball player entering the batter's box with two strikes already against him. In other words, because Hill had not committed a crime and was not resisting arrest, two of the three *Graham* factors automatically weighed against Miracle." *Miracle*, 853 F.3d at 313. Instead, the *Miracle* court, noting that the ultimate goal is to determine weather the officer's actions were objectively reasonable *in light of the circumstances*, laid out three new considerations to be analyzed when dealing with officers confronting a combative subject experiencing a medical emergency: "(1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others? (2) Was some degree of force reasonably necessary to ameliorate the immediate threat? (3) Was the force used more than reasonably necessary under the circumstances (i.e., was it excessive)?" *Id.* at 314. If the answer to the first two questions is "yes" and the answer to the

11

third questions is "no," it is likely that no Fourth Amendment violation has occurred. *Id.* In considering these factors, the Sixth Circuit ultimately found Miracle's use of force reasonable given the circumstances.

Contrary to Wheeler's instance otherwise, the present case is comparable to *Miracle* in multiple respects. First, and most importantly, just like Deputy Miracle encountered Hill in a medically emergent situation, the Deputies here encountered Wheeler in a medically emergent situation. Wheeler had just had a seizure, and like Hill, was disoriented and combative. Just like Deputy Miracle, the officers here believed that Wheeler needed immediate medical attention. Next, just like Hill, Wheeler was warned to relax. In fact, Wheeler was seemingly given even more warnings to relax and calm down than Hill was. It appears, based on the Sixth Circuit's Opinion, that Hill was given one warning. Wheeler was given countless warnings. Finally, just like Hill was warned prior to being drive-stunned that if he did not comply he would be Tased, Wheeler was warned prior to being drive-stunned that if he did not comply he would be Tased.

Wheeler's attempts to distinguish this case from *Miracle* are unconvincing. First, Wheeler argues that "[u]nlike the situation here where a medical condition was ruled out and the officers acted upon their hunch that Mr. Wheeler was in a drug-induced state, the detainee in *Miracle* was definitively diagnosed with a serious medical condition requiring immediate medical intervention which was available and being refused at the scene." (R. 44, Pl.'s Resp., p. 23). This is a distinction without a difference. While the officers here ruled out the possibility of a diabetic episode, they still believed, as Wheeler points out, that Wheeler might be suffering from a drug over-dose or a potential brain-bleed—both of which would require Wheeler to receive immediate medical attention. Moreover, Wheeler was indeed in the midst of medical emergency—he had just suffered a seizure in a public gas station and was disoriented next to a

busy highway. Thus, the officers, and EMT's reasonably believed Wheeler to be experiencing a medical emergency, just as Deputy Miracle reasonably believed Hill to be experiencing a medical emergency.

Next, Wheeler argues that his case is distinguishable from *Miracle* because there was only one officer present in *Miracle*, whereas there were multiple officers present here. There may have only been one officer, but there were four EMT's, all struggling to restrain Hill. From the body-camera footage, it is undeniable that all the officers were struggling to restrain Wheeler, who was combative and noncompliant, just like Hill. Whether four officers were struggling or whether one officer and four EMT's were struggling does not matter. What matters is that the officers were in fact struggling to restrain Wheeler.

Finally, Wheeler claims that unlike Hill, he was not kicking or punching. However, from the body-camera footage, it appears that Wheeler was kicking at one point. In any event, the fact that Hill threw a punch, but Wheeler shoved, swatted, and grappled is not enough for the Court to distinguish this case from *Miracle*, and none of Wheeler's attempts to distinguish this case from *Miracle* persuade the Court to ignore the Sixth Circuit's clear guidance, which instructs the Court to use the *Miracle* factors in medically emergent circumstances instead of being rigidly bound to the *Graham* factors.

Wheeler's argument that *Estate of Armstrong v. Village of Pinehurst* 810 F.3d 892 (4th Cir. 2016), offers "[a] more cogent exploration of the constitutionality of the force used towards Mr. Wheeler" is equally unconvincing. (R. 44, Pl.'s Resp., p. 23). First, *Armstrong* is distinguishable. In *Armstrong*, the Fourth Circuit held that officers violated Armstrong's Fourth Amendment rights when they drive-stunned him to get him to let go of a pole he had wrapped himself around. Unlike this cased, *Armstrong* concerned a mentally ill patient who had escaped a

13

mental facility upon being committed. The officers who drive-stunned Armstrong did not believe him to be in a medically emergent situation that required immediate medical attention. As such, the officers were in a better position to "wait it out" when Armstrong wrapped himself around a post and refused to budge. Here, the officers reasonably believed Wheeler to require immediate medical attention, which precluded them from "waiting it out."

Second, even if *Armstrong* was on all fours with this case, the Court would still be required to follow the Sixth Circuit's holding in *Miracle*. District courts are bound by the decisions of their corresponding circuit courts even if decisions from other circuits seem more persuasive or appealing. *See Timmreck v. United States*, 577 F.2d 372 (6th Cir. 1978), *rev'd on other grounds*, 441 U.S. 780, 60 L. Ed. 2d 634, 99 S. Ct. 2085 (1979). *Armstrong* comes from the Fourth Circuit. *Miracle* comes from the Sixth Circuit. Thus, even if *Armstrong* was on point—which it is not—and even if the Court found the Fourth Circuit's reasoning more persuasive than the Sixth Circuit's—which it does not—the Court would nonetheless be bound by *Miracle*.

Having established that they are indeed applicable to this case, in considering the *Miracle* factors, and viewing the facts in the light most favorable to Wheeler, the Court finds the force used against Wheeler objectively reasonable. The answer to the first *Miracle* factor is yes; Wheeler was experiencing a medical emergency that rendered him incapable of making rational decisions under circumstances that posed an immediate threat of serious harm to himself or others. Wheeler was disoriented and physically combative in a public place next to a major highway. As such, Wheeler indisputably posed a danger to himself and those around him, including both motorist that could have hit him on the highway and bystanders in the gas station. Furthermore, the officers reasonably believed Wheeler to be suffering from a drug over-dose and

or a brain-bleed—each of which require immediate medical attention. Thus, the officers both reasonably believed that Wheeler was experiencing a medical emergency that rendered him incapable of making rational decisions under circumstances that posed an immediate threat of serious harm to himself or others, and Wheeler in fact was experiencing a medical emergency that rendered him incapable of making rational decisions under circumstances that posed an immediate threat of serious harm to himself or others.

The answer to the second Miracle factor is also yes; Some degree of force was necessary to ameliorate the immediate threat Wheeler posed to himself and others. The officers reasonably thought Wheeler needed immediate medical attention due to a drug over-dose or brain-bleed. Moreover, regardless of the cause, Wheeler posed a threat to himself and others as a disoriented, large, combative man in public and in close proximity to a highway. The officers were not in a position to wait the situation out. They needed to get Wheeler to a hospital for evaluation, away from the highway, and out of a public setting. Because Wheeler combatively resisted the officers verbal attempts to do so, some degree of force was necessary to alleviate the ongoing threat that Wheeler posed to himself and others.

Turning to the final factor, the Court finds that the force used was reasonably necessary. The officers tried repeatedly to restrain Wheeler for transport to the hospital peacefully. They repeatedly warned Wheeler that they would be forced to Tase him if he did not stop resisting. When Wheeler was Tased, he was still actively resisting the officer's attempts to restrain him and had been for some time. Nothing in the record suggest that Wheeler was Tased maliciously or gratuitously. Instead, the officers drive-stunned Wheeler in an attempt to gain control over what they perceived, and what was, a dangerous situation. As such, consistent with Sixth Circuit guidance, the Court finds the officers' use of force objectively reasonably as a matter of law. *See*

*Miracle* at 316 (holding that Deputy Miracle drive-stunning Hill was objectively reasonable given the circumstances); *See also Caie v. West Bloomfield Township*, 485 F. App'x 92, 97 (6th Cir. 2012) (Drive-stunning Plaintiff was objectively reasonable when it "served the purpose of gaining control over a highly intoxicated, volatile, and uncooperative subject and neutralizing what a reasonable officer could perceive as a dangerous situation."). Therefore, Wheeler's Fourth Amendment excessive force claim against Redmon is dismissed.

In finding that no excessive force occurred, the Court must also consequently dismiss Wheeler's remaining Fourth Amendment claims against Graves County and Sheriff Redmon for failure to properly train their law enforcement officers. Contrary to Plaintiff's assertion otherwise, it is well settled law that "[i]f no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001); See *also Kareken v. Kehrt*, No. 2011-CA-000633-MR, 2012 WL 1649105, at *7 (Ky. Ct. App. May 11, 2012) (citing, *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed. 2d 806 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of unconstitutionally excessive force is quite beside the point.")).

C. Wheeler's ADA Claim

The Defendants move for summary judgment on Wheeler's ADA claims for a variety of reasons. First, the Defendants claim that Wheeler's Complaint only asserts claims for disability discrimination against John Doe, and then alleges Graves County failed to train him and is vicariously liable for John Doe's discrimination. Next, Defendants argue that reasonable accommodations under the ADA were not required because Wheeler created an

exigency by threatening officers and civilians. Finally, the Defendants argue that, in any event, Wheeler has produced no evidence to establish that force was used on him *because* of his disability. Ignoring, the exigency issue, as well as Defendants' argument that Wheeler only asserted claims against John Doe for violating the ADA, Wheeler responds that "Defendant Graves County through the acts of its Sheriff and officers applied excessive force precisely because of the symptoms, manifestations, and effects of Mr. Wheeler's seizure disorder." (RESP P.35). Even assuming the ADA applies to situations in which an individual is detained for medical treatment, such as here, and assuming Wheeler has brought an ADA claim directly against Graves County and not just a vicarious liability claim for John Doe's violations, Wheeler's claim still fails as a matter of law.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities, of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To succeed on a Title II claim, the plaintiff must make a prima facia showing that "(1) [he] has a disability; (2) [he] is otherwise qualified; and (3) [he] was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of [his] disability." *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015). To satisfy the third element the plaintiff "'must present evidence that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive.'" *Id.* (quoting *Turner v. City of Englewood*, 195 F. App'x 346, 353 (6th Cir. 2006)). The plaintiff need not show that the disability was the *sole* cause, but he must at least show that it was *a* cause and that the discrimination was intentional. *Tucker v. Tennessee*, 539 F.3d 526, 532 (6th Cir. 2008)

(holding that discrimination must be intentional); *Beans v. City of Massillon*, 706 F. App'x 295, 299 (6th Cir. 2017) ("[Plaintiff] need not show [ ] disability was the 'sole cause' of the discrimination.").

Here, Wheeler has failed to produce even a shred of evidence to suggest any animus by the Defendants against individuals with seizure disorders. In fact, the officers detaining Wheeler at no point during his detention knew that he had a seizure disorder. Thus, it is impossible that animus against those with seizure disorders was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive. Simply put, the officers could not have *intentionally* discriminated against Wheeler based on his seizure disorder because they were unaware of it. Thus, Wheelers ADA claims must be dismissed.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS the Defendants' Motion for Summary Judgment. A separate Oder and Judgment shall be filed contemporaneously herewith dismissing all claims against the Defendants in this action with prejudice.

**Thomas B. Russell, Senior Judge**
**United States District Court**

March 21, 2019